Sally GIBBS, Individually and as Beneficiary To the Eileen T. Kashak Family Trust, a Subtrust of the Eileen T. Kashak Living Trust dated June 22, 1999 and as Beneficiary to the Norbert L. Kashak Living Trust dated June 22, 1999, Appellant–Petitioner,

v.

Jack David KASHAK, Individually and as Successor Trustee of the Eileen T. Kashak Family Trust, a Subtrust of the Eileen T. Kashak Living Trust dated June 22, 1999 and as Successor Trustee of the Norbert L. Kashak Living Trust dated June 22, 1999, Appellee–Respondent.

No. 64A03–0706–CV–288.

Court of Appeals of Indiana.

March 31, 2008.

Brian J. Hurley, Valparaiso, IN, Attorney for Appellant.

Donald W. Rice, Portage, IN, Attorney for Appellee.

## OPINION

MAY, Judge.

Sally Gibbs and Jack David Kashak are siblings and the beneficiaries of their parents' trusts. Jack served as trustee until he was removed by court order on August 5, 2005. Sally filed suit seeking partition of land held by the trust and damages from Jack for breach of fiduciary duty. Sally wanted the land sold and the proceeds divided. Instead, the trial court ordered the land divided. It also denied Sally's claim for damages. We affirm.

## FACTS AND PROCEDURAL HISTORY

Norbert and Eileen Kashak owned approximately forty acres of land. There are two houses on the property. Some of the land was used for farming, while other parts of the land were maintained as a park-like setting. Wetlands are scattered across the property, but are concentrated in the eastern half.

Norbert and Eileen each created a trust and deeded their assets, including the land, bank accounts, and stocks to their trusts. Eileen died in December of 2000, and Jack began serving as trustee of her trust in January of 2001. Jack was also made co-trustee of Norbert's trust and had control over all of the trusts' bank accounts as of March 2001. Norbert's health declined after Eileen died, and Jack helped

take care of him. Sally, who lives in Virginia, came home on most weekends to help take care of Norbert. Norbert was placed in a nursing home in October of 2003 and died on May 5, 2004.

Lake Erie Land Company ("LEL"), a developer, owns over 200 acres of land around the Kashak property. LEL's current holdings are not contiguous, and purchasing the Kashak property would enable LEL to connect its parcels. LEL offered to buy the Kashak property several times while Norbert and Eileen were still alive, but they turned down those offers. Shortly after Norbert was placed in the nursing home, LEL offered $1 million for the property, but Jack did not want to sell. Sometime after Norbert's death, LEL offered $2 million, which Jack also turned down. Sally was eager to sell because her son needs to have surgery, Jack has limited income, and the buildings on the property have fallen into disrepair. Jack, however, is unwilling to sell because he has lived on the property most of his life and claims to be living there currently.

After Norbert died, Jack deeded the land from the trust to himself and Sally as tenants in common. Judge Alexa, who originally presided over this case, found Jack did so "to prevent, frustrate, or complicate the sale of the real estate." (Appellant's App. at 38.) When the case was transferred to Judge Thode, he adopted Judge Alexa's findings, determined Jack had breached his fiduciary duty, and removed Jack as trustee on August 5, 2005. Judge Thode declared the transaction void and ordered Jack and Sally to deed the land back to the trust.

Sally also asked Judge Thode to order the property sold and the proceeds divided. Sally wanted the property sold as a whole because LEL has consistently said it wants the entire forty acres or none at all, and no one else offered to buy the property during the pendency of this suit, which was initiated in November 2004. The trial court ordered the land to be divided:

> The Court ... finds that no damage will be done to the property, except for the possible value per acre, by the partition. Accordingly, the court sees no just reason why the property shall not be partitioned so that each party may use the property according to his or her wishes. In accordance with this finding, the property shall be surveyed in order to determine the appropriate line to divide the property.... Plaintiff may determine which of the divided halves to which she wishes to take title.

(*Id.* at 33).

Sally also sought damages for breach of fiduciary duty. While acting as trustee, Jack wrote several checks to "cash," totaling approximately $65,000. Jack kept no record of how this money was spent. The trial court denied Sally's claim for damages without making findings of fact.

## DISCUSSION AND DECISION

 Neither party asked the trial court to issue findings of fact and conclusions of law; however, the court made some findings *sua sponte*.

> Sua sponte findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. When a court has made special findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. First, it must determine whether the evidence supports the trial court's findings of fact; second, it must determine whether those findings of fact support the trial court's conclu-

sions of law. Findings will only be set aside if they are clearly erroneous. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made.

*Estate of Skalka v. Skalka,* 751 N.E.2d 769, 771 (Ind.Ct.App.2001) (*quoting Bronnenberg v. Estate of Bronnenberg,* 709 N.E.2d 330, 333 (Ind.Ct.App.1999)).

### 1. *Division of Land*

Sally argues the trial court's order that the land be divided is clearly erroneous, pointing to evidence the land would sell for significantly less per acre if divided. The trial court acknowledged division might result in a lower per-acre purchase price. (*See* Appellant's App. at 33) ("The Court ... finds that no damage will be done to the property, except for the possible value per acre, by the partition.") However, even faced with the possibility the land might be worth less if divided, the trial court still had discretion to order a division rather than a sale. Indiana Code § 32–17–4–4(d) provides that if a court "determines that the land for which partition is demanded cannot be divided without damage to the owners, the court *may* order the whole or any part of the premises to be sold." (emphasis added).[1]

▪ There was evidence Sally could get fair market value for twenty acres. The trial court appointed commissioners, who filed two reports to the court. Commissioners Armstrong and Briesacher also testified at trial. Although the reports concluded selling the land as a whole would maximize the value of the property, Armstrong and Briesacher both testified it would be possible to sell twenty acres. Commissioner Armstrong testified Sally could get fair market value for twenty

---

1. Sally argues the trial court must order the land to be sold when dividing it will damage the owners, citing *Culley v. McFadden Lake Corp.,* which states:

 If the parties cannot agree on how the land should be partitioned, the trial court appoints three commissioners to resolve their dispute. The commissioners then determine whether the land can be divided and, if it is divided, how it should be accomplished. If the land cannot be divided without damage to the owners, the land is sold. Thereafter, the commissioners file their report with the trial court, which may either confirm or set aside the commissioners' recommendation.

 674 N.E.2d 208, 211 (Ind.Ct.App.1996) (citations omitted). Sally emphasizes the statement, "If the land cannot be divided without damage to the owners, the land is sold," but the next sentence of the opinion recognizes the trial court does not have to accept such a recommendation from the commissioners. Furthermore, *Culley* cites *Pavy v. Pavy,* 121 Ind.App. 194, 98 N.E.2d 224, 226 (1951), which states, "It is only where the land cannot be divided without damage to the owners that the court *may* order a sale of the whole or any part thereof as a means of accomplishing the primary object of the proceedings." (emphasis added). As both Ind.Code § 32–17–4–4(d) and *Pavy* use discretionary language, we do not believe *Culley* limits the trial court's discretion.

 Also relying on *Culley,* Sally argues the trial court impermissibly adopted a portion of the commissioners' reports. 674 N.E.2d at 213. Both reports concluded selling the property as a whole would maximize the value. However, the commissioners also indicated it was possible and fair to divide the property. Thus, the commissioners presented the trial court with two viable options—selling or dividing—depending on whether money or other concerns were given paramount importance. The trial court's decision is consistent with the commissioners' recommendations. (*See* Tr. Vol. 5 at 44) (Armstrong states the land should be sold if "it's only money you're talking about.").

acres. Real estate agent Jennifer Paltzat acknowledged it would be more difficult to sell twenty acres, but also testified larger tracts generally sell for less per acre. She believed it would be possible to sell twenty acres for $1 million. The land is largely undeveloped, there is evidence that Sally will be able to sell half for a fair price, and the land holds great sentimental value for Jack. Therefore, trial court did not abuse its discretion by ordering the land to be divided.[2]

Nevertheless, Sally argues the land cannot be divided because the record "does not provide any insight whatsoever into how to divide the property." (Appellant's Br. at 17.) Armstrong testified he did not know how to divide the property because there are two houses of disparate value and a T-shaped landing strip runs along the northern border and through the center of the property. There are also wetlands throughout the property.

We believe the trial court's order effectively addresses these concerns by giving Sally first choice of the parcels. Jack testified he was willing to take any portion of the property and has apparently accepted that he may not be able to use his landing strip or the house where he currently lives. Sally wants to sell her half and is not interested in using the buildings or the landing strip. The testimony established a buyer would likely not use the buildings and would want a maximum number of dry acres to build on. Presumably, Sally will choose the half that has the least amount of water, leaving Jack, who enjoys nature, with the majority of the wetlands. Sally may choose the portion of the land that will be most attractive to buyers, and is not harmed by any lack of evidence regarding how the land should be divided.[3] Therefore, we affirm the court's order dividing the property.

### 2. *Breach of Fiduciary Duty*

Sally argues the trial court erred by not awarding damages for breach of fiduciary duty because Jack cannot account for how he spent approximately $65,000. Jack testified his parents paid cash for ordinary expenses such as groceries and gas, and he continued that custom. Cindy Mathias, an administrative assistant to the trusts' attorney, testified she reviewed the trusts' bank statements, and it appeared Norbert and Eileen had paid cash for most expenses. She testified there were no checks to or credit card charges from grocery stores, gasoline stations, or the like; therefore, the $65,000 presumably was used for those kinds of expenses.

At trial, Sally focused on the checks written while Norbert was in the nursing home. Jack provided a document estimating how the cash was spent during this time. The expenses included groceries, gas, meetings with counselors, car repairs, clothing for Norbert, and funeral expenses. Jack testified the nursing home rooms were not furnished, and he used some of the money to purchase furniture for Nor-

---

2. Sally objected to testimony from Jack's attorney to the effect that Norbert and Eileen wanted Jack to be able to live on the property for the rest of his life, although that desire was not expressed in the trust documents. Even if admission of this testimony was erroneous, there was other evidence supporting the trial court's judgment.

3. Sally also argues the trial court's order that a surveyor determine the dividing line is error because "the manner of drawing the line should have come before the court during the hearing on the merits of the case." (Appellant's Br. at 17.) The very subject matter of this suit was whether and how the land should be divided; nothing prevented Sally from presenting arguments as to how the land should be divided. We see no error in ordering a surveyor to determine what line will most accurately divide the property in half.

bert's room. He also testified he provided food and transportation for Sally when she came to help take care of Norbert. Sally does not deny Jack paid for her and Norbert's expenses.

■ As trustee, Jack had authority and discretion to make disbursements for the education, health, maintenance, and support of the beneficiaries.[4] There is no indication the $65,000, which was drawn over a period of three years, was disproportionate to the beneficiaries' needs or unnecessarily depleted the trusts, which were worth over $2 million. The trial court made a general judgment on this issue, which we will affirm if it can be sustained on any legal theory supported by the evidence. *Estate of Skalka*, 751 N.E.2d at 771.[5] The foregoing evidence supports a conclusion Jack did not misappropriate or misuse trust funds, and the trial court's judgment is not erroneous.[6]

Affirmed.

RILEY, J., and KIRSCH, J., concur.

---

4. The disputed funds were spent while Norbert was alive; at that time, Norbert, Jack, and Sally were all beneficiaries.

5. Sally argues the transactions were presumed fraudulent and Jack's evidence was insufficient to rebut that presumption. *See e.g., In re Estate of Wade*, 768 N.E.2d 957, 961–62 (Ind.Ct.App.2002) ("[I]f the plaintiff's evidence establishes (a) the existence of a fiduciary relationship, and (b) the questioned transaction ... resulted in an advantage to the dominant party ... 'the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and thus void.' "), *trans. denied* 783 N.E.2d 697 (Ind.2002). The cases Sally relies on concern claims of undue influence, yet it does not appear Sally is claiming Jack exerted undue influence over anyone. On the contrary, he had authority and discretion to make disbursements to Norbert, Sally, and himself. Sally has directed us to no decision holding a disbursement is *presumptively* fraudulent when a trustee who is also a beneficiary makes a disbursement to himself. Such a rule would thwart the intent of the settlor, as the trustee would risk being brought to court every time he made a disbursement to himself.

6. Sally also discusses at length Jack's actions in deeding the property out of the trust. The trial court found this was a breach of Jack's fiduciary duty and ordered the land deeded back to the trust. It does not appear she is requesting further relief on this issue.